**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1098-25

ATLANTIC COUNTY SHERIFFS
and JOSEPH O'DONOGHUE,

      Plaintiffs-Respondents,

v.

STATE OF NEW JERSEY,

      Defendant-Appellant.

_____

JPMORGAN CHASE BANK,
NATIONAL ASSOCIATION,

      Plaintiff-Respondent,

v.

ETHEL J. BROOME,

      Defendant.

_____

WELLS FARGO BANK, N.A.,

      Plaintiff-Respondent,

v.

ERICA FISCHER,

      Defendant.

_____

DITECH FINANCIAL LLC,

      Plaintiff-Respondent,

v.

MICHAEL J. MACECSKO
and CYNTHIA MACECSKO,

      Defendants-Respondents.

_____

PNC BANK, NATIONAL
ASSOCIATION,

      Plaintiff-Respondent,

v.

THOMAS A. COPPOLECCHIA,

      Defendant-Respondent.

_____

U.S. BANK TRUST NATIONAL
ASSOCIATION, NOT IN ITS
INDIVIDUAL CAPACITY BUT
SOLELY AS OWNER  TRUSTEE
FOR RCF 2 ACQUISITION TRUST,

      Plaintiff-Respondent,

v.

2

A-1098-25

LOUIS TENORE,

     Defendant.

_____

SPECIALIZED LOAN SERVICING
LLC,

     Plaintiff-Respondent,

v.

MARTHA MELINDA, JAMIE
SORKIN, LISA ANNE CLOUD,
STATE OF NEW JERSEY, and
UNITED STATES OF AMERICA,

     Defendants.

_____

WELLS FARGO BANK, N.A.,

     Plaintiff-Respondent,

v.

JASON T. GECK,

     Defendant.

_____

FEDERAL HOME LOAN
MORTGAGE CORP., AS TRUSTEE
FOR THE BENEFIT OF THE FREDDIE
MAC SEASONED CREDIT RISK
TRANSFER TRUST, SERIES 2019-3,

     Plaintiff-Respondent,

3

v.

BARBRA MEYERS and DAVID
MEYERS,

     Defendants,

and

WELLS FARGO BANK, N.A.,

     Defendant-Respondent.

_____

U.S. BANK,

     Plaintiff-Respondent,

v.

FRANK ENDICOTT,

     Defendant.

_____

NEWREZ LLC,

     Plaintiff-Respondent,

v.

ALEC SOUTTER, a/k/a
ALEC WINSTON SOUTTER,

     Defendant.

_____

BANK OF AMERICA N.A.,

A-1098-25

Plaintiff-Respondent,

v.

MARGARET G. NELSON, BO
WINKLER, STATE OF NEW
JERSEY, and UNITED STATES
OF AMERICA,

Defendants,

and

HAMILTON POINTE
HOMEOWNERS ASSOCIATION,
INC.,

Defendant-Respondent.

_____

U.S. BANK,

Plaintiff-Respondent,

v.

ROBERT CURRY,

Defendant.

_____

COUNTY OF BURLINGTON,
JOSEPH DEVLIN and BARBARA
DEVLIN,

Respondents.

_____

5

Submitted May 12, 2026 – Decided July 10, 2026

Before Judges Gooden Brown, Torregrossa-O'Connor, and Rosero.

On appeal from an interlocutory order of the Superior Court of New Jersey, Chancery Division, Mercer County, Docket No. C-000094-24.

Jennifer Davenport, Attorney General, attorney for appellant State of New Jersey (Benjamin M. Shultz and Deborah E. Wassel, Assistant Attorneys General, of counsel; Chandra M. Arkema, Deputy Attorney General and Jonathan Peitz, Assistant Attorney General, on the briefs).

Robertson, Anschutz, Schneid, Crane & Partners, PLLC, attorneys for respondent Wells Fargo Bank, N.A. (John D. Krohn, on the brief).

Malamut & Associates, LLC, attorneys for respondent County of Burlington (James K. Grace, on the brief).

Ballard Spahr LLP, attorneys for respondent PNC Bank, N.A. (William P. Reiley, on the brief).

McGovern Legal Services, LLC, attorneys for respondents Joseph Devlin and Barbara Devlin (David W. Merritt, of counsel and on the brief; Damon M. Kress, on the brief).

N. Lynne Hughes, County Counsel, attorney for respondents Atlantic County Sheriffs Office and Joseph O'Donoghue, join in the brief of respondents.

Friedman Vartolo LLP, attorneys for amicus curiae American Institute of Servicing and Legal Executives (Catherine Nicole Aponte, on the brief).

PER CURIAM

Arising from several consolidated cases, the question presented on appeal as a matter of first impression is whether subsection (g) of the Community Wealth Preservation Program Act (CWPP), N.J.S.A. 2A:50-64, enacted on January 12, 2024, violates the Takings Clause of the Federal and State Constitutions by depriving property owners of their right to recover surplus equity in a foreclosure sale and depriving junior lienholders of their interest in potential surplus funds following a sheriff's sale. See U.S. Const. amend. V (barring the taking of private property "for public use, without just compensation"); N.J. Const. art. I, ¶ 20 ("Private property shall not be taken for public use without just compensation . . . first made to the owners."). We hold subsection (g) of the CWPP is unconstitutional as applied because it violates the Takings Clause of the Federal and State Constitutions.

I.

These consolidated cases arise in the wake of the United States Supreme Court's decision in Tyler v. Hennepin Cnty., 598 U.S. 631 (2023), and our Supreme Court's decision in 257-261 20th Ave., Realty, LLC v. Roberto, 259 N.J. 417 (2025). The Tyler Court held by keeping the surplus equity from a tax debt forfeiture of a homeowner's property under Minnesota's tax foreclosure

7

law, Hennepin County committed an unconstitutional taking in violation of the Takings Clause of the Fifth Amendment. 598 U.S. at 639. In Roberto, the Court held a homeowner has "a property right to surplus equity in real property" and "forfeiture of surplus equity without just compensation" to a property owner in a tax sale foreclosure violates the Takings Clause. 259 N.J. at 427-28.

The consolidated cases include: JPMorgan Chase Bank, National Ass'n v. Broome, No. SWC-F-6681-22; Wells Fargo Bank, N.A. v. Fischer, No. SWC-F-19248-19; Ditech Financial LLC v. Macecsko, No. SWC-F-36919-14; PNC Bank, National Ass'n v. Coppolecchia, No. SWC-F-5870-22; U.S. Bank Trust National Ass'n v. Tenore, No. SWC-F-999-24; Specialized Loan Servicing LLC v. Melinda, No. SWC-F-5732-23; Wells Fargo Bank, N.A. v. Geck, No. SWC-F-1361-22; Federal Home Loan Mortgage Corp. v. Meyers, No. SWC-F-3667-23; U.S. Bank v. Endicott, No. SWC-F-79-20; NewRez LLC v. Soutter, No. SWC-F-3541-24; Bank of America N.A. v. Nelson, No. SWC-F-76-23; and U.S. Bank v. Curry, No. SWC-F-12040-22.

In his decision, the trial judge focused on Coppolecchia, Tenore, Meyers, and Soutter. Although each consolidated case contains its own set of facts that are not pertinent to the appeal, all share a common legal challenge to a single

8

feature of the CWPP[1]:  a nonprofit community development corporation's right of second refusal to purchase a foreclosed-upon property for the upset price, N.J.S.A. 2A:50-64(g),[2] precluding both property owners from recovering surplus equity and junior lienholders from recovering potential surplus funds.

On January 12, 2024, the CWPP was signed into law to "promote equity and fairness in foreclosure sales by providing opportunities for foreclosed-upon residents and their next of kin, tenants, and other prospective owner-occupants—along with nonprofit community development corporations—to purchase and finance a foreclosed-upon home."  Press Release, Off. of the Governor, Governor Murphy Signs Legislation Establishing Community Wealth Preservation Program 1 (Jan. 12, 2024).  The CWPP was enacted in response to concerns that New Jersey's foreclosure market, one of the highest in the nation by percentage of properties entering foreclosure, primarily benefitted investors and for-profit corporations, not individual residents.  Ibid.  The CWPP amended

---

[1] A case is fit for review if "[t]he issues in dispute are 'purely legal,' and thus 'appropriate for judicial resolution' without developing additional facts." Comm. to Recall Robert Menendez v. Wells, 204 N.J. 79, 99 (2010) (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967)).

[2] Although subsection (d) was also challenged, none of the consolidated cases presented a scenario where subsection (d) would apply.  The judge therefore limited his review to subsection (g).

A-1098-25

the Fair Foreclosure Act, N.J.S.A. 2A:50-53 to -82, primarily addressing the final step of the foreclosure process, the sheriff's sale.

At the sheriff's sale, the CWPP grants an individual homeowner, their next of kin, or a tenant occupying the foreclosed-upon property a "right of first refusal." N.J.S.A. 2A:50-64(d). This right allows eligible individuals to purchase the property for either the original upset price or the final starting upset price listed for the sale of the property, whichever is lower. Ibid. The CWPP defines "upset price" as "the minimum amount that a foreclosed upon property shall be sold for in a sheriff's sale as determined by the foreclosing plaintiff." N.J.S.A. 2A:50-64(p). The right may be exercised by paying a 3.5% deposit, with the remaining balance due within ninety business days. N.J.S.A. 2A:50-64(d).

Subsection (g) of the CWPP, the provision at issue in this appeal, grants a nonprofit community development corporation (NCDC) the "right of second refusal." N.J.S.A. 2A:50-64(g). The CWPP defines an NCDC as "a not-for-profit organization, whose mission includes community revitalization through the restoration of vacant and abandoned property to create or preserve affordable housing." N.J.S.A. 2A:50-64(p). The right of second refusal is subordinate to the right of first refusal held by individual homeowners, their next of kin, or

A-1098-25

tenants. N.J.S.A. 2A:50-64(g). If the right of first refusal is not exercised, an NCDC may purchase the property for the final starting upset price on the day of the sheriff's sale.[3] Ibid. To exercise this right, the NCDC must pay a 3.5% deposit prior to the opening of the bidding on the property, with the remaining balance becoming due within ninety business days. Ibid.

When an NCDC exercises its right of second refusal, other parties, including junior lienholders, are prevented from bidding on the foreclosed-upon property. As a result, if the property is worth more than the senior lien, junior lienholders cannot bid beyond the amount of the senior lien to acquire the property to mitigate their losses.[4] Furthermore, because an NCDC is only required to pay the upset price, in most scenarios, junior lienholders will not

---

[3] None of the parties, their next of kin, or their tenants exercised the right of first refusal. The heirs in Coppolecchia alleged if they had attended the sheriff's sale, they would have bid on the property, but they did not do so. Ordinarily, that would render any constitutional claims moot but "[b]ecause the appeal presents a question of great public importance, we address the issue." State v. Town of Morristown, 129 N.J. 279, 284 (1992). See Transamerica Ins. Co. v. Nat'l Roofing, Inc., 108 N.J. 59, 64 (1987) ("Even if a matter is technically moot, our courts may retain jurisdiction if to do so is in the public interest . . . .").

[4] For example, in Tenore, the foreclosing lienholder set the price of the property at $304,900. At the sheriff's sale, an NCDC purchased the property for $308,900. The junior lienholder's attorney attended the sale intending to bid $400,000 to cover the value of its lien. However, because the NCDC exercised its right of second refusal, the sheriff did not permit competitive bidding.

A-1098-25

receive any leftover surplus funds because there are none. Likewise, any surplus equity property owners may have in the property is extinguished.

On August 28, 2025, the judge entered an order holding subsection (g) of the CWPP violated the Takings Clause of the Federal and State Constitutions as applied to junior lienholders and property owners. The impetus for the order was several motions to vacate or stay sheriff's sales occurring throughout the State in accordance with N.J.S.A. 2A:50-64(g) following the holdings in Tyler and Roberto. Given the number and nature of the motions, the cases were consolidated. In all but two of the cases, an NCDC purchased the property at a sheriff's sale for the upset price.

Plaintiffs—Atlantic County Sheriff's Office, Atlantic County Sheriff Joseph O'Donoghue, numerous banks and parties across New Jersey—argued, among other things, subsection (g) is unconstitutional because it deprives property owners of their right to surplus equity and junior lienholders of their interest in surplus funds. Defendants—the State of New Jersey[5] and several NCDCs—argued, among other things, the Legislature provided adequate safeguards for parties to vacate sheriff's sales to protect their interests,

---

[5] On September 30, 2024, the State was granted permission to intervene in one of the consolidated cases pursuant to Rule 4:28-4(d). The judge later treated the State as having intervened in all the consolidated cases.

specifically, procedures contemplated under Rules 4:64-1(e) and 4:65-5. According to the State, because these procedural mechanisms exist, subsection (g) is constitutional.

After considering the parties' arguments, the judge entered the August 28, 2025 order. In an accompanying statement of reasons, the judge explained:

> Property owners have a protected property interest in surplus equity, and any taking without just compensation is unconstitutional. In the present cases, [s]ubsection (g) unconstitutionally took the owners' surplus equity by allowing [NCDCs] to purchase the property for the upset price. As a result, junior lienholders also lost the right to redeem potential surplus funds.

The judge elaborated:

> Although [Rule] 4:64-6(b) permits a junior lienholder to engage in discussions regarding the upset price, [s]ubsection (g) does not. As a result, the foreclosing mortgagee may set the upset price at the balance remaining on only its mortgage, which bars both property owner(s) and junior lienholder(s) from recovering their surplus equity and potential surplus funds. Plaintiffs provide myriad examples of third-party [NCDCs] who paid the upset price, which often was far lower than what other members of the public were willing to pay. Permitting these [NCDCs] to purchase these properties for the upset price extinguishes the property owner's right to obtain surplus equity, and, later, the junior lienholder's entitlement to redeem the surplus funds. Subsection (g) permits unconstitutional takings of surplus equity

13

without just compensation and is unconstitutional as applied to [p]laintiffs.

In expressly rejecting the State's reliance on the procedures contemplated under the <u>Rules</u> to provide adequate safeguards to protect property owners' rights and junior lienholders' interests, the judge stated,

> The [<u>Rules</u> d]efendant provides are insufficient to protect property owners' right to surplus equity because the motions they concern are discretionary. Under the [CWPP], in some cases, a sheriff's sale may be procedurally proper but lead to an allegedly unjust result. Furthermore, motions to vacate a sale often rely on whether the sale price was fair market value. Under [s]ubsection (g), the upset price could be far below fair market value. Even if the courts overturn specific sales, the subsequent sales will still follow [s]ubsection (g). Relying on discretionary rules could present the same problem the parties presently face, which could result in a never[]ending motion cycle. This [c]ourt finds these rules inadequate to protect property owners' rights and junior lienholders' interests.

We granted the State's ensuing motion for leave to appeal the August 28, 2025 order. Joseph and Barbara Devlin, the junior lienholders in <u>Coppolecchia</u>, Wells Fargo Bank, N.A. (Wells Fargo), PNC Bank, N.A. (PNC), Burlington County, and amicus curiae American Institute of Servicing and Legal Executives (AISLE), a mortgage loan servicing trade association, are the only other parties

14

participating in the appeal.[6] The State reprises its arguments on appeal, arguing Nelson v. City of New York, 352 U.S. 103 (1956), controls and because junior lienholders have adequate procedural mechanisms encompassed in Rules 4:64-1(e) and 4:65-5, subsection (g) is constitutional. Burlington County supports the State's position. The Devlins, Wells Fargo, PNC, and AISLE take a position contrary to the State's.

## II.

"[W]henever a challenge is raised to the constitutionality of a statute, there is a strong presumption that the statute is constitutional." State v. Muhammad, 145 N.J. 23, 41 (1996). Indeed, "[o]ne of the basic guidelines in analyzing the constitutionality of a statute is 'the presumption that the [L]egislature acted with existing constitutional law in mind and intended the act to function in a constitutional manner.'" NYT Cable TV v. Homestead at Mansfield, Inc., 111 N.J. 21, 26 (1988) (Handler, J., concurring) (quoting State v. Profaci, 56 N.J. 346, 349 (1970)). "Thus, any act of the Legislature will not be ruled void unless its repugnancy to the Constitution is clear beyond a reasonable doubt," Muhammad, 145 N.J. at 41, and "[a]nyone challenging the constitutionality of a

---

[6] Atlantic County Sheriff's Office and Joseph O'Donoghue did not file a merits brief but submitted a letter indicating they were "rely[ing] upon the [m]erits [b]riefs submitted by their fellow [r]espondents."

15

statute bears the burden of establishing its unconstitutionality," State v. One 1990 Honda Accord, 154 N.J. 373, 377 (1998). We review a trial court's rulings of law, including the constitutionality of statutes, "de novo." Sackman Enters., Inc. v. Mayor of Belmar, 478 N.J. Super. 68, 75 (App. Div. 2024).

"[A] law that is challenged for facial vagueness is one that is assertedly impermissibly vague in all its applications." State v. Cameron, 100 N.J. 586, 594 (1985). "Conversely, a law that is challenged 'as applied' is not necessarily vague in all respects but is vague as applied to facts of a particular case." Dempsey v. Alston, 405 N.J. Super. 499, 510 (App. Div. 2009) (quoting Cameron, 100 N.J. at 594).

However,

> [i]n either a facial or as-applied vagueness attack, the level of judicial scrutiny and degree of required clarity will depend on the purpose of the statute, the context in which the law is challenged, the conduct that is subject to its strictures, the nature of the punishment that is authorized, and, finally, the potential impact of the statute upon activities and interests that are constitutionally protected.

> [Ibid. (alteration in original) (quoting Cameron, 100 N.J. at 594).]

A-1098-25

Turning to the constitutional protections at issue, "[t]he Takings Clause, applicable to the [s]tates through the Fourteenth Amendment, provides that 'private property [shall not] be taken for public use, without just compensation.'" Tyler, 598 U.S. at 637 (third alteration in original) (quoting U.S. Const. amend. V). "The New Jersey Constitution provides protections against governmental takings of private property without just compensation, coextensive with the Takings Clause of the Fifth Amendment of the United States Constitution." Klumpp v. Borough of Avalon, 202 N.J. 390, 405 (2010) (citing Mansoldo v. State, 187 N.J. 50, 58 (2006)).

"The Takings Clause 'was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" Tyler, 598 U.S. at 647 (quoting Armstrong v. United States, 364 U.S. 40, 49 (1960)). "Even if just compensation is paid, 'one person's property may not be taken for the benefit of another private person without a justifying public purpose.'" Roberto, 259 N.J. at 446 (quoting Thompson v. Consol. Gas Utils. Corp., 300 U.S. 55, 80 (1937)).

Importantly:

> A constitutional taking may occur in one of two ways:
> 1) via physical taking, in which the government takes title to private property or "authorizes a physical occupation [or appropriation] of property"; or 2) via

A-1098-25

regulatory taking, through which a government regulation deprives the property owner of all economically viable use of their land.

[Klumpp, 202 N.J. at 405 (alteration in original) (quoting Yee v. City of Escondido, 503 U.S. 519, 522 (1992)).]

In Tyler, Hennepin County sold Tyler's home "for $40,000 to satisfy a $15,000 tax bill" that accrued after Tyler's family moved her to a senior community for her safety but neglected to pay the property taxes due on her home. 598 U.S. at 634-35. "Instead of returning the remaining $25,000, the County kept it for itself." Id. at 634. This was consistent with Minnesota's tax forfeiture law, which afforded taxpayers one year to pay their annual property tax assessment. Id. at 635. "If [a taxpayer] does not timely pay, the tax accrues interest and penalties, and the County obtains a judgment against the property, transferring limited title to the State." Ibid.

"The delinquent taxpayer then has three years to redeem the property and regain title by paying all the taxes and late fees." Ibid. If the taxpayer remains delinquent, at the end of the three years, "absolute title [would] vest[] in the State," thereby extinguishing the delinquent taxpayer's debt, and Minnesota could "keep the property for public use or sell it to a private party." Ibid. "If the property is sold, any proceeds in excess of the tax debt and the costs of the

sale remain with the County, to be split between it, the town, and the school district." Ibid. "The former owner has no opportunity to recover th[e] surplus." Ibid.

The Court highlighted that "[s]tates have long imposed taxes on property" and "[s]uch taxes are not themselves a taking." Id. at 637. The Court also acknowledged that in collecting taxes from delinquent taxpayers, states "may impose interest and late fees" and "may also seize and sell property, including land, to recover the amount owed." Id. at 637-38. However, the Court posited whether the money remaining after the seizure constituted "property under the Takings Clause" protected from "uncompensated appropriation[s] by the State" remained an open question. Id. at 638.

Drawing on state law, "traditional property law principles," "historical practice," and precedent, the Court determined Tyler retained a property interest in the excess value of her home above the taxes owed.[7] Id. at 638-39 (quoting Phillips v. Wash. Legal Found., 524 U.S. 156, 167 (1998)). According to the Court, because Hennepin County "confiscate[d] more property than was due," it "effected a 'classic taking in which the government directly appropriate[d]

_____

[7] The Court examined other contexts under Minnesota law in which a property owner was entitled to the surplus value beyond the value of a debt, including mortgage foreclosures. Tyler, 598 U.S. at 645.

19

private property for its own use,'" entitling Tyler "to just compensation."  Id. at 639 (quoting Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency, 535 U.S. 302, 324 (2002)).

The Tyler Court distinguished Nelson, where:

> New York City foreclosed on properties for unpaid water bills.  Under the governing ordinance, a property owner had almost two months after the city filed for foreclosure to pay off the tax debt, and an additional [twenty] days to ask for the surplus from any tax sale.  No property owner requested his surplus within the required time.  The owners later sued the city, claiming that it had denied them due process and equal protection of the laws.  In their reply brief before th[e] Court, the owners also argued for the first time that they had been denied just compensation under the Takings Clause.
>
> [Tyler, 598 U.S. at 643-44 (citations omitted).]

In rejecting the belated argument, the Court explained:

> New York City's ordinance . . . permitted the owner to recover the surplus but required that the owner have "filed a timely answer in [the] foreclosure proceeding, asserting his property had a value substantially exceeding the tax due."  Had the owners challenging the ordinance done so, "a separate sale" could have taken place "so that [they] might receive the surplus."  The owners did not take advantage of this procedure, so they forfeited their right to the surplus.  Because the New York City ordinance did not "absolutely preclud[e] an owner from obtaining the surplus proceeds of a judicial sale," but instead simply defined the process through which the owner could claim the surplus, [the Court] found no Takings Clause violation.

20

[Id. at 644 (last alteration added) (citations omitted) (quoting Nelson, 352 U.S. at 110).]

The Court continued, in contrast,

> [u]nlike in Nelson, Minnesota's scheme provides no opportunity for the taxpayer to recover the excess value; once absolute title has transferred to the State, any excess value always remains with the State. The County argues that the delinquent taxpayer could sell her house to pay her tax debt before the County itself seizes and sells the house. But requiring a taxpayer to sell her house to avoid a taking is not the same as providing her an opportunity to recover the excess value of her house once the State has sold it.

> [Tyler, 598 U.S. at 644-45.]

Our Supreme Court adopted Tyler in Roberto. See Roberto, 259 N.J. at 440 ("Under the Supremacy Clause, [Tyler] is the source of authority on the Takings Clause for federal and state courts alike." (citing Cooper v. Aaron, 358 U.S. 1 (1958))). Roberto involved a challenge to the Tax Sale Law (TSL), N.J.S.A. 54:5-1 to -137, then in effect.[8] Id. at 426. There, the defendant "owned a mixed-use commercial and residential property" and had "failed to pay $606 in sewer tax bills." Id. at 427-28. The plaintiff "purchased that debt pursuant

---

[8] The Court stated it was "evaluat[ing] the version of the [TSL] in effect before it was amended in 2024," and clarified that after Tyler was decided, our Legislature "amended the [S]tate's tax foreclosure laws" to allow "[o]wners" to "seek to have any surplus funds . . . returned to them." Roberto, 259 N.J. at 426, 434.

to the TSL." Id. at 427. Years later, when the plaintiff began the foreclosure process, "the redemption amount was approximately $33,000." Ibid. Because the defendant "did not respond or redeem the property, a default judgment was entered," as a result of which the defendant "stood to lose his ownership interest in the property" which "was worth considerably more than the accumulated debt at the time—possibly as much as $500,000 more." Ibid.

Our Supreme Court held that "the TSL . . . [was] unconstitutional to the extent it allow[ed] for the forfeiture of surplus equity without just compensation." Ibid. The Court clarified that "because private lienholders act jointly with local governments under the TSL to perform a traditional public function[,] . . . they [were] . . . state actors" and the State recognizes a "property right to surplus equity in real property." Id. at 427-28. The Court also determined the "public purpose" requirement was met as the TSL "enables municipalities . . . to collect taxes." Id. at 446.

The Court stated, "New Jersey's [TSL], like Minnesota's scheme, 'permit[s] foreclosure of a property owner's equity' 'above the lien amount owed.'" Id. at 431 (second alteration in original) (quoting 257-261 20th Ave. Realty, LLC v. Roberto, 477 N.J. Super. 339, 362 (App. Div. 2023)). "Under the TSL, unpaid property taxes create a continuous lien on a property for taxes

owed," and "[t]he TSL enables municipalities to 'convert[] that lien into a stream of revenue by encouraging the purchase of tax certificates on tax-dormant properties.'" Id. at 432 (second alteration in original) (citing Simon v. Cronecker, 189 N.J. 304, 318 (2007)).

These certificates are sold at auction, and "[t]he successful bidder 'agrees to pay . . . the municipality the taxes or assessments due.'" Id. at 433 (omission in original) (citing Cronecker, 189 N.J. at 319). During this stage, "[t]he delinquent owner still has title to the property" but the successful bidder "acquires an 'inchoate interest [that] consists of three rights: the right to receive the sum paid for the certificate with interest'; 'the right to redeem' any later-issued tax sale certificate; 'and the right to acquire title by foreclos[ure].'" Ibid. (alterations in original) (quoting Varsolona v. Breen Cap. Servs. Corp., 180 N.J. 605, 618 (2004)). Property owners retain the right to redeem even at this stage, but if they choose not to redeem, "the purchaser of the certificate can file an action in court 'to foreclose the right of redemption,'" ibid. (quoting N.J.S.A. 54:5-86(a)), and "[o]nce the court enters final judgment, title to the property 'vest[s] in the purchaser.'" Id. at 433-34 (alteration in original) (quoting N.J.S.A. 54:5-87).

23

In invalidating the TSL, the Court acknowledged that like Minnesota, "New Jersey . . . has long recognized a property right to surplus equity in different contexts." Id. at 443. For example,

> [i]n a civil action for foreclosure or satisfaction of a mortgage, money raised from the sale of the mortgaged property "shall be applied to pay off and discharge the moneys ordered to be paid, and the surplus, if any, shall be deposited with the court and . . . shall be paid to the person or persons entitled thereto, . . . as the court shall determine." N.J.S.A. 2A:50-36, -37. The defendant in a foreclosure action, among other claimants, may apply for the "withdrawal of surplus moneys." R. 4:64-3(a), (b); see also N.J.S.A. 2A:50-37; Danes v. Smith, 30 N.J. Super. 292, 301-02 (App. Div. 1954) (acknowledging that when a "sheriff's sale produced a substantial surplus beyond the mortgage debt," the surplus was "available for distribution according to the respective interests of the parties").
>
> [Roberto, 259 N.J. at 443 (citations reformatted).]

See also Morsemere Fed. Sav. & Loan Ass'n v. Nicolaou, 206 N.J. Super. 637, 642 (App. Div. 1986) (explaining that after foreclosure judgment, junior lienholders were entitled to surplus funds). The Court concluded while "lienholders are entitled to recover [the] debts they are owed," "they are not entitled to surplus equity in property that exceeds that amount." Roberto, 259 N.J. at 448.

Here, relying on <u>Tyler</u> and <u>Roberto</u>, we hold subsection (g) of the CWPP is unconstitutional as applied as it violates the Takings Clause of the Federal and State Constitutions.[9]   In determining whether there has been a Takings Clause violation, a court considers:   (1) whether the party has a protected property interest; (2) whether the government action effects a taking of that property interest; (3) whether that taking is for a public use; and (4) if so, whether the statute adequately provides the party with just compensation. <u>Ruckelshaus v. Monsanto Co.</u>, 467 U.S. 986, 1000-01 (1984); <u>see also</u> <u>Mansoldo</u>, 187 N.J. at 59 (adopting the United States Supreme Court's factors for evaluating regulatory takings claims, "the most important of which are the 'economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations [and] the character of the governmental action.'"   (alteration in original) (quoting <u>Penn Cent. Transp. Co. v. New York City</u>, 438 U.S. 104, 124 (1978))).

---

[9]  The parties do not raise a facial challenge to subsection (g).  Nonetheless, we acknowledge there are circumstances in which no unconstitutional taking would occur if there is no surplus equity in the property following a sheriff's sale to an NCDC.

A-1098-25

Critically, as the Roberto Court determined, "New Jersey recognizes a property right to surplus equity in real property." Roberto, 259 N.J. at 427. If property owners are entitled to surplus equity, junior lienholders must also be entitled to their interest in the potential surplus funds following a sheriff's sale and the CWPP effects a taking of that property interest. The CWPP also serves a public purpose. The CWPP creates new protections for individuals and families subject to foreclosure, their next of kin, tenants, who may have paid rent to the defaulting landlord for years and now face the prospect of losing their homes, and NCDCs. This fits squarely within the Court's interpretation of "public use." See Kelo v. City of New London, 545 U.S. 469, 479 (2005) ("[T]h[e] 'Court long ago rejected any literal requirement that condemned property be put into use for the general public.'" (quoting Haw. Hous. Auth. v. Midkiff, 467 U.S. 229, 244 (1984))).

Further, though private, NCDCs may be considered state actors. As the Roberto Court pointed out:

> The Supreme Court in Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982), articulated a two-part approach to determine whether actions by a private party may be "fairly attributable to the State":
>
> First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct

imposed by the State or by a person for whom the State is responsible. . . . Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State.

More recently, the Court reviewed the state action doctrine and highlighted three distinct circumstances as examples of when a private party can be considered a state actor: "(i) when the private entity performs a traditional, exclusive public function; (ii) when the government compels the private entity to take a particular action; or (iii) when the government acts jointly with the private entity." Manhattan Cmty. Access Corp. v. Halleck, 587 U.S. 802, 809 (2019) (citations omitted).

[Roberto, 259 N.J. at 444 (citations reformatted).]

Here, our State government acts with NCDCs to curb investors and for-profit entities from participating in the State's foreclosure market by providing NCDCs with the right of second refusal. NCDCs' mission "includes community revitalization" and preservation of "affordable housing," N.J.S.A. 2A:50-64(h)(2), both local government functions. Lastly, the CWPP does not adequately provide property owners or junior lienholders with just compensation for surplus equity or surplus funds following a sheriff's sale. We

27

therefore conclude subsection (g) of the CWPP effects a taking without just compensation.

We now turn our focus to whether there are adequate procedural mechanisms present, like in Nelson, for property owners and junior lienholders to recover any excess value to forestall a Takings Clause violation. In Nelson, on which the State relies, the New York City ordinance gave "a property owner . . . almost two months after the city filed for foreclosure to pay off the tax debt, and an additional [twenty] days to ask for the surplus from any tax sale." Tyler, 598 U.S. at 644; see Nelson, 352 U.S. at 104 n.1 (detailing the ordinance). In contrast, the CWPP is silent on whether property owners may receive the surplus equity or whether junior lienholders may receive the surplus funds if an NCDC exercises its right of second refusal. As such, this case more closely aligns with Tyler and Roberto than Nelson.

Although Tyler and Roberto involved tax foreclosure laws, the same underlying principles apply. The holdings correlate with our mortgage foreclosure law, specifically the CWPP, because the central issue is not the type of foreclosure involved but whether the statutory scheme results in an unconstitutional taking. Based on our analysis of Nelson, Tyler, Roberto, and the CWPP, we conclude that subsection (g) of the CWPP does. The

28

constitutional protection does not depend on whether the foreclosure is initiated by a taxing authority or a private mortgagee. It depends on whether the governmental scheme results in the deprivation of a constitutionally protected property interest.

The State contends Rules 4:64-1(e) and 4:65-5 provide adequate procedural mechanisms, aligning the CWPP with the ordinance in Nelson and allowing it to withstand constitutional challenge. We disagree. Rule 4:64-1(e) provides: "A party holding a subsequent encumbrance for a sum certain and filing an uncontesting answer may have the encumbrance included for payment in the foreclosure judgment on the filing of proofs pursuant to [Rule] 4:64-2." (Emphasis added). Significantly, the CWPP allows the NCDC to purchase the property for the final starting upset price on the day of the sheriff's sale. The statute defines the "upset price" as "the minimum amount that a foreclosed upon property shall be sold for in a sheriff's sale as determined by the foreclosing plaintiff." N.J.S.A. 2A:50-64(p). As such, the upset price, as determined by the foreclosing plaintiff rather than a foreclosure judgment entered by a court, controls. See Eagle Truck Transp., Inc. v. Bd. of Rev., 29 N.J. 280, 289 (1959) ("[W]hen the Legislature has specifically defined a term, the courts are bound by the definition.").

29

In any event, unlike the ordinance in <u>Nelson</u>, which provided that a property owner had "[twenty] days to ask for the surplus from any tax sale," <u>Rule</u> 4:64-1(e) is a discretionary rule. <u>Tyler</u>, 598 U.S. at 644. If a court were to decide that a junior lienholder, even after filing an uncontested answer, was not entitled to include the debt in the final foreclosure judgment, the question of whether there has been a taking would once again present itself in our courts. Stated simply, such a discretionary rule is inadequate to protect junior lienholders' rights. The <u>Rule</u> also fails to address the surplus equity a property owner would lose if an NCDC were to exercise its right of second refusal.[10]

Turning to <u>Rule</u> 4:65-5, the <u>Rule</u> provides:

> A sheriff who is authorized or ordered to sell real estate shall deliver a good and sufficient conveyance in pursuance of the sale unless a motion for the hearing of an objection to the sale is served within [ten] days after the sale or at any time thereafter before the delivery of the conveyance. Notice of the motion shall be given to all persons in interest, and the motion shall be made returnable not later than [twenty] days after the sale, unless the court otherwise orders. On the motion, the court may summarily dispose of the objection; and if it approves the sale and is satisfied that the real estate was sold at its highest and best price at the time of the sale,

---

[10] In <u>Roberto</u>, the Court pointed out that to reconcile <u>Tyler</u>, New Jersey's amended tax foreclosure laws allowed owners to "demand a judicial sale or internet auction and seek to have any surplus funds from the sale returned to them" to "preserve their equity in property being foreclosed." <u>Roberto</u>, 259 N.J. at 434 (citing N.J.S.A. 54:5-87(b) (2024)).

> it <u>may</u> confirm the sale as valid and effectual and direct the sheriff to deliver a conveyance as aforesaid.
>
> [(Emphasis added).]

Once again, <u>Rule</u> 4:65-5 provides a discretionary remedy the court is free to withhold. Under the <u>Rule</u>, an objector has no entitlement to relief but is subject to the court's equitable judgment. Further, the language of the <u>Rule</u> is in stark contrast to the CWPP. The CWPP provides an NCDC may exercise its right of second refusal by paying the upset price. However, <u>Rule</u> 4:65-5 requires a court to analyze whether the "real estate was sold at its highest and best price at the time of the sale." <u>Ibid.</u> If the NCDC is only required to pay the upset price before competitive bidding begins, there is no way for a court to determine whether the upset price paid by the NCDC was the "highest and best price." <u>Ibid.</u>

Once the right of second refusal is exercised by the NCDC, the CWPP's mechanics quashes competitive bidding and eliminates the lienholder's right of redemption, allowing the property to be conveyed at a deflated purchase price and leaving aggrieved parties with no legal mechanism to protect their property right to equity in the property. Under these circumstances, discretionary judicial intervention does not suffice to prevent a constitutional injury. As such, <u>Rule</u> 4:65-5 is also inadequate to protect property owners' rights and junior

31

lienholders' interests and does not constitute an adequate procedural mechanism akin to the ordinance in Nelson. Discretionary post hoc relief by a court would also undermine the CWPP.

Equally unavailing is the State's contention that alternative remedies, such as the right of redemption or pursuing the property owner's personal assets as unsecured debts, provide adequate opportunities for junior lienholders to protect their interests in surplus equity. Such reasoning effectively abrogates both Tyler, 598 U.S. at 644, and Roberto, 259 N.J. at 435-36, where the respective Courts held that the value of the lien itself, rather than the underlying debt, was the property interest protected by the takings clause.

The CWPP contains a severability provision that reads:

> If any provision or section of this act shall be held to be unconstitutional, said provision or section shall be exscinded and the remainder of the provisions and sections of the act as amended or supplemented shall be and remain valid with the same effect as if said provision so held to be unconstitutional had never been a part of the act.

> [N.J.S.A. 2A:50-2.4.]

"An entire statute will not be invalidated when one clause is found to be unconstitutional unless that clause is so intimately interconnected with the whole that it can be reasonably said that the Legislature would not have enacted

the statute without the offending clause." <u>Affiliated Distillers Brands Corp. v. Sills</u>, 56 N.J. 251, 265 (1970). In making that determination, we must decide "whether the objectionable feature can be excised without substantial impairment of the principal object of the statute." <u>Ibid.</u> Here, the object of the CWPP will not be impaired by the invalidation of subsection (g). Thus, all other portions of the CWPP remain, including subsection (d), subject to amendment.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hanley

Clerk of the Appellate Division

A-1098-25